UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                        )<br>)<br>YAMING NINA QI HANSON,          )<br>)<br>Defendant.                              )<br>_____) | Criminal No. 09-0071 (PLF) |

OPINION AND ORDER

This matter is before the Court on defendant Yaming Nina Qi Hanson's motion for bond review filed on March 9, 2009 and her second motion for bond review filed on March 20, 2009. The government filed an opposition on March 25, 2009, and the Court held hearings on these motions on March 25, 2009 and April 1, 2009. At the conclusion of the second hearing, the Court took the matter under advisement and promised a written opinion shortly thereafter. On April 6, 2009, Mrs. Hanson's attorney filed a motion to withdraw his appearance which the Court subsequently granted. Awaiting the entry of an appearance by new counsel, the Court issued an order on April 9, 2009, indicating that, in fairness to Mrs. Hanson and her new lawyer, the Court would not make a decision until after new counsel had an opportunity to present any additional arguments with respect to the bond review motions. New counsel entered his appearance on April 23, 2009 and filed a supplemental memorandum of law in support of defendant's second motion for bond review on April 28, 2009. The Court heard further argument on April 30, 2009. Defendant, through her new counsel, filed a further supplement in support of her motion on May 8, 2009, and the government filed a response later that same day.

I. BACKGROUND

A three-count indictment was returned by a grand jury against defendant Yaming Nina Qi Hanson; her husband, Harold Dewitt Hanson; and ARC International LLC, a company of which Mrs. Hanson allegedly was the co-owner and president. Mrs. Hanson and her husband are charged in the first count of the indictment with conspiracy to violate the International Emergency Economic Powers Act and the Export Administration Regulations, in violation of 18 U.S.C. § 371. Mrs. Hanson is charged in the second count of the indictment with violations of the International Emergency Economic Powers Act, 50 U.S.C. § 1705, and the Export Administration Regulations, 15 C.F.R. §§ 744 and 764.2. Her husband is charged in the third count with making a false statement in violation of 18 U.S.C. § 1001.

The indictment alleges that the defendants illegally exported unmanned aerial vehicle ("UAV") autopilot components to the People's Republic of China. According to the government, Mrs. Hanson carried these UAV components to Germany and handed them to an acquaintance who took them to China. The government represents that these sophisticated components enable UAVs to perform certain tasks without the aid of human pilots, including autonomous take offs, bungee launches, and hand launches and landings, and that they have other tactical military uses. Moreover, according to the government's expert, UAVs equipped with these components could be used to simulate stealth planes and cruise missiles to test air defense detection systems, and potentially could be armed. Thus, the United States has made a foreign policy and legal determination that these items should be controlled for national security reasons through licensing. The government alleges that, at the time Mrs. Hanson smuggled these items

out of the United States, both defendants knew that a license was required for the export of such items. The government represents that, by its calculation, the base offense level for the offenses with which Mrs. Hanson is charged under the United States Sentencing Guidelines is 26. Assuming a Criminal History Category of I, Mrs. Hanson is facing a guideline sentencing range of between 63 and 78 months in prison.

All of these representations were made to Magistrate Judge Alan Kay at a detention hearing on February 17, 2009. At the conclusion of the hearing, Magistrate Judge Kay concluded that Mrs. Hanson should be held without bond under the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, finding that there were no conditions of release that would reasonably assure her future presence in court. Among other things, he found that the charges against her were serious and carried a potential for a significant period of incarceration; that the government has strong evidence against Mrs. Hanson, including her own statements to investigators that she smuggled the UAV autopilot components out of the United States and knew there were licensing requirements for such items; and that she has strong ties to China (including the fact that she owns property in China), despite the fact that she is a naturalized citizen of the United States. On the basis of the information provided to it, this Court agrees with these factual findings.

## II. THE BAIL REFORM ACT

Our system of criminal justice embraces a strong presumption against detention. "'In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" United States v. Gloster, 969 F. Supp. 92, 96-97 (D.D.C. 1997) (quoting United States v. Salerno, 481 U.S. 739, 755 (1987)). The Bail Reform Act of 1984 sets forth the

limited circumstances in which a defendant may be detained before trial despite the presumption in favor of liberty. The Act provides that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). The Act also provides for pretrial detention when the Court finds by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant in court as required. See 18 U.S.C. § 3142(e); United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987). As the D.C. Circuit has said, "[t]hat preponderance must, of course, go to the ultimate issue: that no combination of conditions -- either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful -- can 'reasonably' assure that the defendant will appear for trial." United States v. Xulam, 84 F.3d 441, 442 (D.C. Cir. 1996).

   The Act sets out a number of conditions that may be used to ensure appearance, including third party custody; maintaining employment; abiding by restrictions on place of abode or travel; reporting on a regular basis to a designated law enforcement agency; complying with a curfew; executing a bail bond; and any other condition that the Court deems "reasonably necessary" to assure appearance. 18 U.S.C. § 3142(c). In deciding whether available conditions will reasonably assure the defendant's appearance, a court is to consider the nature and circumstances of the offense, including whether it is violent or nonviolent in nature; the weight of the evidence; the history and characteristics of the person, including her character, family ties, employment, length of residence in the community, community ties, past conduct, criminal

history, and record of court appearances; and the danger the defendant poses to the community if released. See 18 U.S.C. § 3142(g).

The Court's review of the magistrate judge's bail determination is *de novo*. The Court is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons. See United States v. Anderson, 384 F. Supp. 2d 32, 33 (D.D.C. 2005); United States v. Karni, 298 F. Supp. 2d 129, 130 (D.D.C. 2004) (citing United States v. Hudspeth, 143 F. Supp. 2d 32, 35-36 (D.D.C. 2001)). In a pretrial detention hearing conducted under the Bail Reform Act, both the government and the defendant may present evidence by way of proffer, rather than by presenting live testimony. United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996); United States v. Karni, 298 F. Supp.2d at 131.

### III. THE PARTIES' ARGUMENTS

The government argues that while Mrs. Hanson is a naturalized citizen of the United States, she has more significant ties to China and sufficient financial resources to make her a serious flight risk. She currently has no job in the United States. As recently as February 2009, she indicated in her passport renewal application that she intended to leave the United States and go to China for a six-month period. The government proffers that Mrs. Hanson has a son, an ex-husband, siblings and other relatives in China, and that, by contrast, her marriage to her co-defendant is troubled and that he may be seeking a divorce. Furthermore, Mrs. Hanson owns two properties in China and maintains close business connections there with friends and former classmates. The government further argues that, although Mrs. Hanson has now surrendered or has had confiscated from her six passports -- some from China, some from the

United States, some current and some expired -- she would easily be able to obtain a new passport through the Chinese Embassy. They also point out that she used her official U.S. passport, rather than her tourist passport, on the day she allegedly departed the United States to travel to China with the UAV components in her luggage.

Mrs. Hanson responds that she does have longstanding ties to the United States. She came to the United States in 1989 on a student visa to attend graduate school and later obtained a temporary green card, which became permanent in 1993. Between 1991 and 1993, Mrs. Hanson worked as a travel agent, serving mainly the Chinese immigrant community, in New York City. In 1994, she moved to San Francisco where she met her co-defendant, whom she married in 1998. Mr. and Mrs. Hanson jointly own a home in Salinas, California, valued at between $250,000 and $350,000, and rent a home in the Washington Metropolitan area. Mrs. Hanson became a naturalized United States citizen in 1999. Mrs. Hanson represents that she has serious medical problems, and the D.C. Jail confirms that she currently takes six different medications.

During their ten years of marriage, the Hansons have spent almost all of their time living abroad, in Germany, Italy and South Korea. Their stays abroad were because of Mr. Hanson's service as a health officer for the United States Army at various army hospitals around the world. In November 2007, Mr. Hanson left his post in South Korea to come to Washington, D.C. to work at the Walter Reed Army Medical Center. Mr. and Mrs. Hanson are now renting a house in Silver Spring, Maryland. Mrs. Hanson's adopted 27-year-old son lives with them. During 2008, Mrs. Hanson spent most of her time abroad, sometimes for personal reasons and sometimes for business reasons; in fact, during calendar year 2008, she spent only 22 days in the

United States. Mrs. Hanson has no criminal record in the United States and (so far as is known) no criminal record abroad.

For the hearing on April 1, 2009, Mr. Alanis Binani traveled from New York City to attest to Mrs. Hanson's integrity, trustworthiness and reliability. Mr. Binani was Mrs. Hanson's employer from 1991 to 1993. He expressed his confidence that Mrs. Hanson will not flee if released on bond and even offered his home as security for her appearance. Mrs. Hanson's lawyers argue that Mrs. Hanson had an opportunity to flee between January 29, 2009 (when her home in Maryland was searched and she was interrogated) and February 12, 2009 (when she was arrested), but did not flee. The government, they maintain, has proffered no evidence of Mrs. Hanson's intent to flee.

In sum, the government's primary arguments for detention without bond are that: (1) Mrs. Hanson, although a naturalized United States citizen, actually has closer ties and greater affinity with China; (2) because her marital relationship is faltering, she has no family reasons to remain in the United States; (3) because of the potential sentence she faces in a case where the government has very strong evidence, she has an incentive to flee the country; (4) despite the fact that Mrs. Hanson has surrendered her passports, it would be very easy for her to get a new Chinese passport from the Embassy and depart for China; (5) because of her business interests, family ties and property in China, Mrs. Hanson could relocate with ease. For her part, Mrs. Hanson insists that none of these arguments, or the evidence offered in support of them, suffice to support her pretrial detention. The Court finds that there are conditions of release that, in combination, will reasonably assure her appearance in court as required.

IV. DISCUSSION

A similar situation was presented to Judge Hogan in <u>United States v. Karni</u>, 298 F. Supp. 2d 129 (D.D.C. 2004). The defendant in that case was an Israeli national who lived in South Africa with his wife and one of his children; he had been a resident of South Africa for eighteen years and owned a home there. Like Mrs. Hanson, Mr. Karni was charged with violating the Export Administration Regulations and the International Emergency Economic Powers Act. As here, the weight of the evidence against Mr. Karni was "substantial." Moreover, like Mrs. Hanson, he had no known criminal history in the United States or elsewhere. <u>See</u> <u>United States v. Karni</u>, 298 F. Supp. 2d at 132. Unlike Mrs. Hanson, Mr. Karni was not a United States national and had no ties to either the United States or to the Washington, D.C. area. He owned no property in this country and had no family living here. <u>Id</u>.

Upon consideration of the relevant factors under the Bail Reform Act, Judge Hogan determined that there was no evidence of an intent to flee and there was some combination of conditions that would reasonably assure the defendant's presence in court when required. <u>See</u> <u>United States v. Karni</u>, 298 F. Supp. 2d at 132-33. <u>Compare</u> <u>United States v. Anderson</u>, 384 F. Supp. 2d at 36 (finding "strong circumstantial evidence of [Anderson's] clear interest in fleeing the jurisdiction and his intent to do so" by virtue of his use of aliases and false identities and possession of literature on how to disguise identity and hide assets). In this case, like <u>Karni</u> and unlike <u>Anderson</u>, there is no strong circumstantial evidence indicating that Mrs. Hanson intends to flee the United States. The conditions Judge Hogan found appropriate in <u>Karni</u> were home detention with electronic monitoring; a waiver of rights not to be extradited to the United States should Mr. Karni return to Israel or South Africa; a $75,000 bond posted by a

third party; the posting of $100,000 in cash by Mr. Karni from his own funds; and release into the custody of a third party. See id. at 133.

In considering whether similar conditions might work in this case, the Court requested the District of Columbia Pretrial Services Agency ("PSA") to screen Mrs. Hanson to determine if she was eligible for the High Intensity Supervision Program ("HISP"). PSA reports that Mrs. Hanson is eligible for placement in this program, and recommends that she be placed in the Home Confinement Phase of the program with global positioning system ("GPS") monitoring. Under HISP, Mrs. Hanson would wear a GPS bracelet on her ankle at all times and could leave her home only after receiving authorization from PSA for specific purposes (*i.e.*, verified appointments with her defense lawyers or doctor). Once the GPS monitoring device is activated, Mrs. Hanson's location is tracked by G4S, PSA's electronic monitoring vendor. If Mrs. Hanson were to remove or otherwise tamper with the GPS ankle bracelet, or were to enter or leave a specific pre-defined area, the system would report automatically to the electronic monitoring vendor, which in turn will provide notification to PSA. In order to ensure that Mrs. Hanson would be monitored 24 hours a day, seven days a week, PSA has agreed to arrange with G4S for it to simultaneously notify two special agents (one from the Department of Commerce and the other from the FBI) of infractions by Mrs. Hanson.

The Court concludes that conditions similar to those imposed in Karni will reasonably assure that Mrs. Hanson will appear in court when required. The Court does not believe, despite defense counsel's arguments to the contrary, that reasonable conditions at this

time include permitting Mrs. Hanson to leave her home to seek employment or to attend religious services. The Court will, however, release Mrs. Hanson on bond with the following conditions:

1. Mrs. Hanson will participate in the High Intensity Supervision Program ("HISP") with global positioning system ("GPS") monitoring under the supervision of the District of Columbia Pretrial Services Agency ("PSA").

2. Mrs. Hanson is being released into the Home Confinement Phase of the program, meaning that she is to reside at

, with her husband.

3. Mrs. Hanson will keep the GPS equipment properly charged and to maintain it in accordance with the directions she will be given.

4. Mrs. Hanson will wear a GPS ankle bracelet at all times to enable appropriate monitoring by HISP and agrees not to tamper with or remove it for any reason without authorization.

5. Mrs. Hanson may leave her home only after receiving authorization from PSA for verified appointments with her defense lawyers or doctors as needed. She is not authorized to leave her home to seek employment or to attend religious services.

6. Mrs. Hanson is expressly prohibited, as a condition of supervision, from entering or being in the immediate vicinity of Union Station or any airport without specific permission of this Court, including (but not limited to) Washington Reagan National Airport, Washington Dulles International Airport and Baltimore-Washington International Airport.

7. Mrs. Hanson is expressly prohibited, as a condition of supervision, from leaving the United States.

8. PSA shall arrange for G4S, its electronic monitoring vendor, to directly notify Special Agent Philip R. Kuhn or Special Agent Kristen B. Komer immediately upon receipt of an infraction or possible infraction, whenever it may occur, seven days a week, 24 hours a day.

9. If PSA is alerted or notified during business hours of any infraction or possible infraction by Mrs. Hanson, a representative of PSA shall immediately call the Chambers of the undersigned and shall immediately coordinate with Special Agent Philip R. Kuhn and/or Special Agent Kristen B. Komer.

10. Mrs. Hanson agrees not to seek to obtain any new passport during the pendency of this matter and to surrender any additional passports she has not already surrendered, whether current or expired.

11. Mr. and Mrs. Hanson shall post their home in Salinas, California, as security subject to immediate forfeiture should there be any infraction by Mrs. Hanson of the conditions set forth in this Opinion and Order.

These requirements will be conditions precedent to Mrs. Hanson's release on bond. Once these preconditions are met, PSA shall present a formal release order to the Court. Should any of these conditions be violated, the agents who will be notified are authorized to take Mrs. Hanson into immediate custody.

SO ORDERED.

DATE: May 12, 2009

/s/_____
PAUL L. FRIEDMAN
United States District Judge